**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SOUTHWEST REGIONAL COUNCIL OF CARPENTERS, et al., | CV 17-6582 DSF (MRWx) |
| Plaintiffs, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| PHIL LIMON, | |
| Defendant. | |
| AND RELATED CLAIMS | |

The matter of Counterclaim Plaintiff Phil Limon's First, Second, Fourth, Sixth, Eighth, and Ninth Counterclaims against the United Brotherhood of Carpenters and Joiners of America (UBC), the Southwest Regional Council of Carpenters, and Carpenters Local Union 721 (collectively, the Unions) was tried to the Court on February 26 and 27, 2019. Pursuant to the Court's Order re Findings of Fact and Conclusions of Law, see ECF 228, the Unions submitted to the Court proposed findings of fact and conclusions of law. ECF 237. Limon filed objections to the Unions' findings of fact and conclusions of law.[1] ECF 238. After reviewing the evidence submitted at trial, and all post-trial submissions, the Court finds the following[2]:

## NATURE OF THE CASE AND JURISDICTION

1.      This case concerns a former union member's challenge, pursuant to the Labor-Management Reporting and Disclosure Act of 1959 (the LMRDA), 29 U.S.C. §§ 401-531, to an international union's decision to expel him from membership. It also addresses a number of related claims.

2.      The Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

## PROCEDURAL HISTORY

3.      On September 7, 2017, the Southwest Council and Local 721 filed this action against Limon, a product development technician whom the UBC had expelled from membership for his conduct in connection with distributing a $20,000 grievance settlement. *See* ECF 1 (Compl.).

---

[1] The Court has eliminated or revised some facts to which Limon objected because the Court determined that those facts were not necessary to its determination, or were not relevant, not necessarily because the Court disagreed with the facts as stated.
[2] Any finding of fact deemed to be a conclusion of law is incorporated into the conclusions of law. Any conclusion of law deemed to be a finding of fact is incorporated into the findings of fact.

4.     In their five-page complaint, the Southwest Council and Local 721 alleged that Limon was demanding to inspect confidential union records, and they requested a declaratory judgment that Limon, as an expelled UBC member, had no right to inspect those records under LMRDA § 201(c) (29 U.S.C. § 431(c)).  *See id.*

5.     Limon filed counterclaims against the Southwest Council and Local 721, and also filed claims against their international parent, the UBC.  *See, e.g.*, ECF 90 (Second Am. Compl. (SAC)).[3]

6.     Limon alleged (as Counterclaim 2) that the UBC did not afford him the "fair hearing" guaranteed by LMRDA Section 101(a)(5) (29 U.S.C. § 411(a)(5)) because, according to Limon, the three-person UBC Trial Committee that considered the disciplinary charges against him consisted of members who were biased against him.  *See* ECF 90 (SAC) ¶ 105(e)(i)-(ii).[4]

7.     He further alleged (as part of Counterclaim 2) that the UBC "created an unfair . . . [hearing] procedure by using the UBC's attorneys . . . to advise the Trial Committee," *id.* ¶ 105(e)(iv), and that the UBC attorney's "communications [with] the members of the Trial Committee" deprived him of a fair hearing, *id.* ¶ 105(e)(v).

8.     Limon also alleged (as Counterclaim 4) that the UBC violated LMRDA Section 609 (29 U.S.C. § 529), which forbids unions from punishing a member "for exercising any right to which he is entitled under" the LMRDA, by allegedly disciplining

---

[3] Daniel O'Donnell also filed claims against the UBC as part of this action.  The Court dismissed or entered summary judgment on all of O'Donnell's counterclaims before trial. *See* ECF 88 (Order on MTD); ECF 113 (Order on Second MTD); ECF 174 (Order on SJ re: Facial Challenge to UBC Const.); ECF 208 (Am. Order on SJ re: Limon Countercl.).

[4] The Court dismissed or entered summary judgment on some of Limon's claims before trial.  *See* ECF 88 (Order on MTD); ECF 113 (Order on Second MTD); ECF 174 (Order on SJ re: Facial Challenge to UBC Const.); ECF 208 (Am. Order on SJ re: Limon Countercl.).

him for questioning the Southwest Council's invoices, opposing its preferred candidates for local union office, and exercising "free speech." ECF 90 (SAC) ¶¶ 117, 118, 121.

9. Limon requested (as Counterclaim 1) a declaratory judgment that his expulsion was improper, and that he remains a UBC member entitled to inspect union records under LMRDA § 201(c) (29 U.S.C. § 431(c)).

10. Limon challenged (as Counterclaim 6) the UBC's February 2017 decision to dissolve a local Carpenters union and merge its members into Local 721. He claimed that the reorganization was retaliatory and in bad faith, and therefore violated the LMRDA.

11. Limon alleged (as Counterclaim 8) that he had formed a contract with the Southwest Council and Local 721 under California law, and that the unions had breached that alleged contract by refusing to allow him to inspect union records. ECF 90 (SAC) ¶¶ 150-57.

12. He alleged (as Counterclaim 9) that the Southwest Council and Local 721 had committed the California law tort of "false promise" by promising to produce records for inspection, and then failing to do so. *Id.* ¶¶ 158-77.

13. The Unions denied liability and asserted as affirmative defenses that Limon: (i) waived most procedural objections by skipping his union disciplinary hearing (Affirmative Defense 3); (ii) is barred from relief by the doctrine of "unclean hands" (Affirmative Defense 4); and (iii) failed to mitigate his alleged damages (Affirmative Defense 6). ECF 200 (Prop. Final Pretrial Conf. Order).

14. The UBC also argued that "Limon has no standing to pursue Counterclaim 6 [challenging the reorganization of the local unions] unless he prevails on Counterclaim 2 or 4." ECF 194 (Unions' Mem. of Contentions) at 8-9. "If he loses on those claims," the UBC argued, "then he has no standing to complain about the merger of Local 1553 into Local 721 because he is not a UBC member." *Id.*; *see also* ECF 200 (Final PTC Order) at 28-29 (same).

15.     Starting on February 26, 2019, the Court conducted a bench trial.  ECF 219-20 (Docket Entry).[5]

16.     Limon testified and also called as witnesses Benjamin Carbajal, a former officer of Limon's local union (Carpenters Local Union 1553), and Daniel O'Donnell, the dissenting member of the three-person UBC Trial Committee that voted to expel Limon. *See* ECF 221 (List of Exhibits and Witnesses).

17.     The Unions called as witnesses Trial Committee members Dennis Donahou and Bill Rose, and the Southwest Council's Executive Secretary-Treasurer Daniel Langford.  *See id.*

18.     The Court received into evidence seventy-five documentary exhibits and received into evidence, without objection, excerpts of deposition transcripts of Limon and O'Donnell.  *See id.*

## **FINDINGS OF FACT**

### A.     **Payment of Grievance Settlement**

19.     In 2014, Local 1553 settled a labor grievance that had alleged a breach of a collective bargaining agreement by Raytheon Company.  ECF 200 (Final PTC Order) at Stip. Fact 3.

20.     Under the settlement, Raytheon would pay $20,000 to "Environmental Technicians designated by the Union."  *Id.* at Stip. Fact 4.

21.     Raytheon employed four Environmental Technicians:  John Samoian, Erick Musick, Luis Paradiso, and Jose Galicia.  *Id.* at Stip. Fact 5.

22.     Under federal law, Local 1553 owed each of these four workers a "duty of fair representation":  a duty to represent "all members of a designated unit . . . without hostility or discrimination toward any."  *Vaca v. Sipes*, 386 U.S. 171, 177 (1967).

---

[5] Limon waived the right to jury trial.  *See* ECF 197 (Order Confirming Limon's Waiver of Jury Trial).

23. Phil Limon was Local 1553's Senior Steward and Financial Secretary-Treasurer. ECF 200 (Final PTC Order) at Stip. Fact 6.

24. Limon also was a member of the UBC and Local 1553. *Id.* at Stip. Fact 1.

25. Limon had known one of the four workers—John Samoian—for several years. Tr. 164 (Limon).

26. Limon and Samoian shared the same opinions about certain union matters. Tr. 164-65 (Limon) ("yeah, we shared some opinions, yes").

27. Limon considered Eric Musick hostile to the union and to the labor movement. Ex. 90 (Limon Sept. Dep.) at 52-53 ("Q. You perceived [Musick] as anti-union. Is that fair? A. Yeah. Well, on a scale of 1 to 10, 10 being a big supporter versus 1 being an anti-anti, I would put him at like around a 2, 1 or 2, something.").

28. Limon was aware that Luis Paradiso had not been paying union dues, a fact Limon brought up when Paradiso later confronted him. Tr. 166 (Limon) ("Q. And that's something that you brought up with him when he came to complain about the $20,000? A. It was mentioned, yes, an exchange.").

29. As a senior steward, Limon had attended steward trainings. Tr. 163 (Limon).

30. Limon "understood as a senior steward that [he] and the union had a duty of fair representation to . . . all bargaining unit members." Tr. 166-67 (Limon).

31. Limon understood that "if an officer plays favorites, that can hurt the Union." Tr. 167 (Limon).

32. Limon decided to make John Samoian the sole recipient of the entire $20,000 Raytheon settlement payment, cutting the other three workers out of $5,000 each. Tr. 214 (Limon) ("Q. Mr. Limon, as I understand your testimony, Kevin Dodd told you to pay who you wanted and then later you decided to pay only Samoian and cut out the other three workers; is that right? A. Yes. That's what happened."); Ex. 7 (Limon

Text to Griggs) ("my decision to only pay Samoian . . . has cost u your job"); Ex. 11 (Limon Text to Griggs) ("I take all Responsibility . . . .").

33.    Section 51(A)(1) of the UBC Constitution prohibits conduct "[c]ausing dissension among the members of the United Brotherhood." Ex. 49 (UBC Const.) at 71.

34.    The UBC interprets its "causing dissension" rule to forbid divisive conduct such as playing favorites with the distribution of grievance settlements. As one of the three Trial Committee members explained:

> [T]he more unity that's involved in a bargaining unit, the stronger that unit is; and when things happen or things are done to cause fighting amongst the membership, things like giving one person what should have been given to four people, that causes—I cannot even imagine the kind of havoc that that would cause in my own Local where I came from. The—that kind of stuff ruins Unions.

Tr. 372 (Rose).

35.    On February 9, 2016, Limon sent two text messages to John Samoian: "U should be getting settlement next payday $20K" and "Keep private." Ex. 50 (Limon/Samoian Texts) at 2.

36.    Samoian expected that the $20,000 would be divided equally among all four workers: he responded to Limon by text: "20K / 4 right?" Ex. 50 (Limon/Samoian Texts) at 2.

37.    Limon replied: "Just u!  Pal.  All yours." Ex. 50 (Limon/Samoian Texts) at 2.

38.    The three other environmental technicians had been equally harmed by Raytheon's violations of the collective bargaining agreement: Paradiso "had been sent home for lack of work" while Raytheon was breaching the contract by giving work to persons outside the bargaining unit. Ex. 90 (Limon Sept. Dep.) at 63.

39.   Limon eventually would acknowledge that the three workers he cut out of the settlement had been "harmed." Ex. 6 (July 9, 2016 Email).

40.   Years later, Limon would acknowledge "error on my part," and that his "hasty decision to only pay Samoian is something that [he] deeply regret[s] and ha[s] agonized over" because it was "a very costly lesson learned for not only myself but our Union." Tr. 171 (Limon); Ex. 3 (Limon's UBC General Executive Board (GEB) Appeal).

### B.   The Workers Learn They Did Not Receive Any of The Settlement

41.   Even though Limon told Samoian to "[k]eep [his receipt of all the settlement money] private," the three workers learned that they had been cut out of their $5,000 shares of the $20,000. Tr. 167 (Limon).

42.   The three workers confronted Limon on May 1, 2015. Tr. 167, 173 (Limon).

43.   Musick asked Limon "two or three times who made the decision." Tr. 167 (Limon).

44.   Musick "accused [Limon] of pretending not to know what [Musick] was talking about." Tr. 167 (Limon).

45.   After Musick "pressed [him] and pressed [him], [Limon] finally said that [Kevin] Dodd, [Steve] Griggs and [Limon] together had made the decision." Tr. 167 (Limon).

46.   Specifically, Limon told the workers that "the union including Kevin Dodd, myself, and Steve Griggs" had made the decision to give all of the money to Samoian. Ex. 89 (Limon July Dep.) at 95.

47.   Limon's statement that Dodd and Griggs had made the decision was untrue, because, in fact, Limon alone had "decided to pay only Samoian and cut out the other three workers." Tr. 214, 216 (Limon); Ex. 7 (Limon Text to Griggs); Ex. 11 (Limon Text to Griggs); Ex. 3 (GEB Appeal).

48.     The three workers became angry at Griggs, at Dodd, at Limon, and at the union. Tr. 168 (Limon) ("They seemed angry in general, I would say. So when you say at Griggs, they were just angry at the Union, including Griggs, myself and Dodd.").

49.     Limon admitted they became angry at Griggs, Dodd, and Limon "[b]ecause we were the union representatives.  I was the senior steward, Dodd was the senior business agent, and Griggs was the union business agent."  Ex. 90 (Limon Sept. Dep.) at 50.

50.     Musick was "visibly agitated," "red in the face," and "speaking with an elevated voice."  Tr. 167-68 (Limon).

51.     Two of the three workers were angry enough to file unfair labor practice charges against Local 1553 with the National Labor Relations Board (NLRB).  Tr. 168 (Limon).

C.     **The NLRB Proceeding**

52.     On June 23, 2015, Limon submitted a sworn affidavit to the NLRB in which he repeated what he had told the three workers on May 1, 2015 about Dodd's and Griggs' purported involvement.  Ex. 38 (Limon NLRB Aff.).

53.     Specifically, Limon averred that "Dodd, . . . Griggs, and I made the decision to award the entire monetary settlement to Samoian.  We made this decision by evaluating Samoian's involvement in the grievance process."  Ex. 38 (Limon NLRB Aff.).

54.     On February 10, 2016, the NLRB conducted a hearing.  Ex. 41 (NLRB Decision) at 1.

55.     The NLRB issued a subpoena commanding Limon to appear and testify. Ex. 90 (Limon Sept. Dep.) at 90; *see also* Ex. 41, at 4.

56.     Local 1553's counsel also asked Limon to appear and testify.  Ex. 90 (Limon Sept. Dep.) at 89-90.

57. "Nobody at the UBC ever told [Limon] that they were upset at [him] for showing up . . . and testifying," Limon admits. Ex. 90 (Limon Sept. Dep.) at 94.

58. In his live testimony before the NLRB, Limon repeated that he, Dodd, and Griggs together made the decision to give the $20,000 to Samoian. Ex. 48 (NLRB Tr.) at 67, 79.

59. Specifically, Limon testified:

> Q: [Y]ou met with Kevin Dodd and Steve Griggs to decide how to
>    decide the settlement money, right?
>
> A: Yes.
>
> Q: Did the three of you decide to give the entire $20,000 settlement to
>    John Samoian?
>
> A. Yes.

Ex. 48 (NLRB Tr.) at 67.

60. Limon also testified:

> Q: [W]ho made the decision to award the entire monetary settlement
>    to Mr. Samoian?
>
> A: The Union did.
>
> Q. Who from the Union?
>
> A. Myself, Steve Griggs, and I believe Kevin might have had some—
>    some—something to say about it, too, I believe.
>
> Q. Okay. So you didn't make the decision alone by yourself?
>
> A. No.

Ex. 48 (NLRB Tr.) at 79.

61. On May 10, 2016, the NLRB issued its decision, finding, *inter alia*, that: the Union violated [the National Labor Relations Act] when it distributed . . . settlement monies pursuant to an arbitrary criteria . . . .

Although Samoian, Musick, Paradiso and Galicia were affected by the outcome of the ITF grievance since the work at issue was work they would now be performing, the Union decided to give the entire settlement award to Samoian . . . while Musick and Paradiso, along with Galicia, did not receive any money . . . .

Ex. 48 (NLRB Tr.) at 9.

62.     The NLRB ordered Local 1553 to "make employees whole, with interest, for any losses they suffered due to [Local 1553]'s failure to designate the recipient of the . . . settlement monies in accord with rationale [sic], non-arbitrary criteria." Ex. 48 (NLRB Transcript) at 11.

D.     **Limon Admits He Made The Decision to Pay All of The Settlement to Samoian**

63.     After the NLRB's decision, the Southwest Council terminated Griggs's employment. Ex. 11 (Limon Text to Griggs).

64.     On May 24, 2016,[6] Limon sent Griggs a private text message: "I take all Responsibility for ULP [unfair labor practice], whatever u need, let me know." Ex. 11 (Limon Text to Griggs).

65.     On July 5, 2016, Limon sent Griggs another private text message: "Because of my decision to only pay Samoian & my testimony, has cost u your job. No excuses from me, I'm living with this. Sorry doesn't cut it, for my faults & failure." Ex. 7 (Limon Text to Griggs).

66.     On July 9, 2016, Limon emailed four union leaders (the Southwest Council's Randy Thornhill and Dan Langford, the UBC's Phil Newkirk, and Local 1553's president Joe Lotta):

---

[6] The proposed findings occasionally assert dates that the Court does not find in the evidence cited. Where Limon does not object to the dates, the Court includes them. The specific dates have no impact on the Court's findings.

Steve Griggs knew nothing about my decision to pay only Samoian. I never told Griggs about the other 3 employees harmed in that classification because Kevin Dodd had told me to pay whoever I wanted. . . . I figured no need to look into what Griggs wanted me to investigate and identify who to pay. I knew of these other employees . . . but never told Griggs they were out there despite his request multiple times to ID them to him. I apologize for blaming Griggs for my decision . . . .

Ex. 6 (July 9, 2016 Email).

67. None of Limon's May 24, 2016 text message, his July 5, 2016 text message, or his July 9, 2016 email claimed that Limon had been following any unwritten Local 1553 policy in giving the entire $20,000 grievance settlement to John Samoian. Ex. 7 (Limon Text to Griggs); Ex. 11 (Limon Text to Griggs); Ex. 6 (July 9, 2016 Email).

68. On September 10, 2016, Limon submitted a complaint to the California State Bar against Local 1553's attorneys. Tr. 216 (Limon).

69. Limon's bar complaint accused a Local 1553 lawyer of "suborning perjury" from him. Tr. 216 (Limon).

70. Limon also averred on November 16, 2016, in a notarized appeal to the UBC's General Executive Board, that his NLRB affidavit had been false. Ex. 3 (GEB Appeal), at 2-3.

71. Specifically, Limon wrote to the General Executive Board: "When I gave my [NLRB] affidavit I identified Dodd, Griggs, and myself as the decision makers when in fact, I alone made the decision." Ex. 3 (GEB Appeal), at 2.

72. The story that Limon told the three workers and the NLRB under oath is contrary to what he later told Steve Griggs, union leaders, and the UBC General Executive Board. *Compare* Ex. 89 (Limon July Dep.) at 95 *and* Ex. 38 (Limon NLRB

Aff.)) *with* Ex. 7 (Limon Text to Griggs) *and* Ex. 11 (Limon Text to Griggs) *and* Ex. 6 (July 9, 2016 Email) *and* Ex. 3 (GEB Appeal).

73.     Limon admits that he has made contradictory statements.  *E.g.*, Tr. 175-76 (Limon) ("Q. . . . [Y]ou acknowledge now that your [July 9] email contradicts what you told the NLRB under oath?  A. Yes.").

74.     The Court finds that Limon generally was not credible, and his testimony is entitled to little weight.  He has changed his story depending on his audience and objective.  *Compare* Ex. 89 (Limon July Dep.) at 95 *and* Ex. 38 (Limon NLRB Aff.)) *with* Ex. 11 (Limon Text to Griggs) *and* Ex. 11 (Limon Text to Griggs) *and* Ex. 6 (July 9, 2016 Email) *and* Tr. 216-17 (Limon) *and* Ex. 3 (GEB Appeal).[7]

75.     Even during his trial before this Court, Limon repeatedly made statements that were contradicted by his prior sworn testimony, and the Unions' counsel repeatedly impeached his trial testimony on that basis.  *E.g.*, Tr. 165-67, 168, 169, 192-93, 214-15.

## E.     **Charges Are Brought Against Limon**

76.     On July 15, 2016, UBC Eastern District Vice President Mike Capelli brought internal union disciplinary charges against Limon pursuant to the procedure in Section 14D of the UBC Constitution.  ECF 200 (Final PTC Order) at Stip. Fact 11.

77.     The charging document accused Limon of violating three provisions of the UBC Constitution, one of which was "Causing dissension among the members of the United Brotherhood."  ECF 200 (Final PTC Order) at Stip. Fact 13.

78.     In late July 2016, Limon received from the UBC an eight-page, single-spaced charging document, and an explanation of the hearing procedures.  Tr. 161 (Limon); Ex. 14 (Charges).

---

[7] "[P]revious falsehoods . . . [a]re probative of [a witness's] lack of truthfulness."  *United States v. Reid*, 634 F.2d 469, 473-74 (9th Cir. 1980).

79.     On approximately August 9, 2016, Limon received written notice that a UBC Trial Committee would conduct a hearing starting at 2 p.m. on September 27, 2016 at an address approximately 35 miles from his house.  Ex. 90 (Limon Sept. Dep.) at 171; Ex. 15 (Hrg. Notice); Tr. 161 (Limon).

80.     Limon understood that he had "the right to present [his] case before a Trial Committee."  Ex. 90 (Limon Sept. Dep.) at 155; *see also* Tr. 161 (Limon).

81.     Limon understood that he had the right to "appear at the hearing and make statements in [his] defense."  Ex. 90 (Limon Sept. Dep.) at 155.

82.     Limon understood that he had the right to call witnesses.  Ex. 90 (Limon Sept. Dep.) at 156.

83.     Limon understood that he had the right to have a UBC member act as his representative.  Ex. 90 (Limon Sept. Dep.) at 156-57; *see also* Tr. 161.

84.     Limon told Griggs by telephone that he was considering skipping his hearing.  Tr. 162 (Limon) ("I told him that I may [skip].").

85.     Limon "understood that if [he] didn't show up, [his] hearing would go on without [him]."  Tr. 162 (Limon).

86.     Limon "never asked the UBC . . . to postpone [his] hearing."  Tr. 163 (Limon).

87.     Limon did not attend the September 27, 2016 hearing in person or by a representative.  ECF 200 (Final PTC Order) at Stip. Fact 17.

88.     Limon testified:

> Q.   But you were thinking about you might file a lawsuit against the unions?
>
> A.   I don't recall saying that.  I might have. . . .
>
> Q.   So what [attorney Griggs] was telling you is "The move is don't go to your [union] trial, and then file a lawsuit"?  That's what he planned to do.

A.  "Don't go to trial and file a lawsuit."  He may have mentioned
        that, something along those lines.

Ex. 90 (Limon Sept. Dep.) at 167-68.

F.  **The UBC Appoints a Trial Committee**

89.  Pursuant to Section 14D of the UBC Constitution, the UBC appointed a three-person "Trial Committee" composed of UBC Southern District Vice President Dennis Donahou and UBC representatives William Rose and Dan O'Donnell.  ECF 200 (Final PTC Order) at Stip. Fact 14.

90.  Limon admittedly knew none of the Trial Committee members.  Tr. 160 (Limon).

91.  Trial Committee members Donahou and Rose confirmed that they had never heard of Limon, of Local 1553, or of the alleged political disputes that Limon claims motivated their disciplinary decision.  Tr. 303-04 (Donahou) ("Q. Prior to the Limon disciplinary proceeding, what did you know about Limon or Local 1553?  A. I didn't."); Tr. 341 (Rose) ("Q. Prior to the Limon disciplinary case, had you ever heard of Phil Limon or Local 1553?  A. No.").

92.  The dissenting Trial Committee member, O'Donnell, did not testify otherwise.  Tr. 278 (O'Donnell).

93.  The Trial Committee members who voted against Limon—Donahou and Rose—presented in court as fair-minded persons capable of judging Limon's conduct fairly on the basis of the evidence presented.

94.  Dissenting Trial Committee member O'Donnell testified that he heard Donahou state, "[a]fter [Limon's hearing] adjourned," that Limon might have been hoping that Samoian would share the $20,000 with him.  Tr. 287-88 (O'Donnell).

95.  Such a remark by Donahou does not constitute evidence of prejudgment or bias on the part of Donahou, as the remark postdated the internal union hearing at which

Donahou had heard the evidence that Limon had given $20,000 to Samoian at the expense of three workers.  *See* Ex. 48 (Hr'g Exs.).

96.    O'Donnell confirmed that Limon's text to Samoian, see Ex. 48, at 5, seemed to have made Donahou and Rose genuinely "suspicious" of Limon's intentions.  Tr. 254 (O'Donnell) ("[T]hey thought it was suspicious that he had sent the text . . . .").  The Court agrees.

97.    O'Donnell also claimed that Donahou, after Limon's disciplinary hearing, made a remark about a good business agent knowing how to let a company get rid of someone like Limon.  Tr. 287-88 (O'Donnell).  *But see* Tr. 313 (Donahou) ("I don't remember saying that, no."); Tr. 347 (Rose) ("Q. Now, do you recall Dennis Donahou saying anything about a good business agent would know how to let a company fire a steward like Limon? A. No.").

98.    Nevertheless, such a post-hearing remark, if it occurred, does not indicate prejudgment or bias on the part of Donahou because it postdated the presentation of the evidence.

99.    Further, O'Donnell did not include anything about Donahou's alleged post-hearing remark in his dissent.  Tr. 290 (O'Donnell) (O'Donnell admits he "didn't put anything like that in [his] dissent," a document in which he recorded "the most critically important things.").

100.    Neither Limon nor his counsel presented a persuasive explanation of why such a post-hearing remark might be evidence of prejudgment or bias on the part of Donahou.

101.    In sum, Limon did not prove that any member of his UBC Trial Committee had prejudged his guilt or was otherwise biased.

102.    Further, Limon did not prove that the identity of the Trial Committee members or the circumstances surrounding his disciplinary proceeding created a risk of bias.

### G. **Limon's UBC Disciplinary Hearing**

103. On September 27, 2016, the Trial Committee heard testimony and reviewed documentary evidence. ECF 200 (Final PTC Order) at Stip. Fact 15.

104. A licensed court reporter transcribed the hearing. *Id.* at Stip. Fact 16; Ex. 47 (Union Hrg. Tr.).

105. Limon did not attend the September 27, 2016 hearing in person or by a representative. ECF 200 (Final PTC Order) at Stip. Fact 17.

106. The Trial Committee members, including dissenting member Donahou, had the opportunity to ask questions of the witness and the charging party during the hearing, and they did ask questions. Ex. 47 (Union Hrg. Tr.) at 13, 14, 18, 21, 45-46, 47, 48-49, 52-53, 59, 60, 61 (questions by O'Donnell).

107. Section 52(J)(6) of the UBC Constitution provides: "Before the Trial Committee shall begin their deliberations, all other persons shall leave the trial room." Ex. 49 (UBC Const.) at 78.

108. Trial Committee Chairman Donahou cleared the hearing room of everyone but the three Trial Committee members before deliberations began. Tr. 238 (O'Donnell) ("Q. When you began deliberations, who else was in the room? A. Mr. Dennis Donahou, Mr. Bill Rose, and myself."); *see also* Tr. 311 (Donahou) (only three Trial Committee members present); Tr. 346 (Rose) (same).

109. Deliberations began with a preliminary vote, and Rose and Donahou both voted guilty. Tr. 311-12 (Donahou); Tr. 346 (Rose); Tr. 273 (O'Donnell).

110. O'Donnell declined to vote. Tr. 313 (Donahou) ("He didn't want to vote."); Tr. 346-48 (Rose) ("He didn't vote").

111. According to O'Donnell, Trial Committee member "Donahou said [during deliberations] that he thought Limon caused dissension"—conduct prohibited by the UBC Constitution—"because the other bargaining unit members were upset they didn't get any settlement money." Tr. 273-74 (O'Donnell).

16

112. Even O'Donnell (who ultimately dissented from the majority decision) agreed that he "could understand how three workers cut out of a settlement would be upset." Tr. 273-75 (O'Donnell).

### 1. UBC Attorney Brian Quinn's Involvement

113. The UBC has a history of making legal counsel available to UBC Trial Committees, as Donahou explained to the Court, based on his experience participating as a Trial Committee member "in approximately ten or so [similar] hearings." Tr. 321 (Donahou) ("[A]lways there's been the chance to ask the attorney if we had any questions concerning procedure.").

114. On September 27, 2016, approximately 15 or 20 minutes after deliberations had started, Chairman Donahou requested that UBC attorney Brian Quinn come into the room. Tr. 349 (Rose) ("Q. . . . If the room was empty when deliberations began, how long into deliberations before Mr. Quinn appeared? A. It seemed like maybe it was 20 minutes or so."); Tr. 315-16 (Donahou) ("[M]aybe 15 minutes into the deliberations.").

115. Chairman Donahou invited Quinn into the room principally because O'Donnell had procedural questions:

> [Quinn] knocked on the door, and he said, "Do ya'll all have any questions for me?" And I said, "Yes, we do. Mr. O'Donnell has brought up a couple of things about evidence he'd like to ask," and I think maybe I had a question or two.

Tr. 315-16 (Donahou); *see also* Tr. 349-50 (Rose) ("Q. Did Dan O'Donnell have any questions? A. Yeah. He had a lot of questions. That was all he was doing was making— you know, asking questions.").

116. O'Donnell's questions concerned the topic of whether the Trial Committee could consider evidence outside the record, or whether the Trial Committee could conduct its own investigation:

Part of the reason that I had asked him to come in is O'Donnell had
raised the question about whether we needed the collective bargaining
agreement and the settlement, did that need to be in our hands before
we could deliberate. I had answered to O'Donnell that we had to
deliberate on the evidence that was presented to us, and that was a
question that was brought up to Quinn.

Tr. 320 (Donahou).

117. Rose further explained (in response to the Court's questions):

THE COURT: So you were in the room deliberating, and at some
point Mr. Quinn came in?

THE WITNESS: Yes.

THE COURT: How did that happen? Do you remember?

THE WITNESS: Dan O'Donnell had some questions. I think he
wanted to have a copy of the contract between Raytheon and the
Union [which was not part of the record], and I think that was the
primary reason.

Tr. 351-52 (Rose).

118. Quinn did not attend Limon's disciplinary hearing. Tr. 308 (Donahou);
Tr. 344 (Rose).

119. Chairman Donahou formally suspended deliberations while Quinn was
present. Tr. 316 (Donahou) ("So I invited him in, and we postponed deliberations.")
(Donahou); Tr. 352 (Rose) ("THE COURT: Was there any deliberating going on among
the three of you while Quinn was in the room? THE WITNESS: No.").

120. Deliberations were suspended approximately 10 or 15 minutes. Tr. 316
(Donahou) ("10 to maybe 15, but more like 10 minutes."); Tr. 349 (Rose) ("Maybe ten,
fifteen minutes.").

121.    In total, deliberations the day of the hearing lasted about one and one-half hours.  Tr. 292 (O'Donnell) ("[W]e deliberated for an hour, an hour and a half . . . ."); Tr. 313 (Donahou) ("deliberations lasted about an hour and a half" approximately); Tr. 347 (Rose) ("A little over an hour.").

122.    In answering the Committee's questions, Quinn was calm, not angry. Tr. 316-17 (Donahou) ("Q. Was he angry?  A. No."); Tr. 350 (Rose) ("Calm.").

123.    Tables and chairs had been arranged in a horseshoe pattern for the hearing; the three Trial Committee members sat at the end of the horseshoe, and Quinn sat at the right-hand side of the horseshoe during the consultation.  Tr. 316 (Donahou); *see also* Tr. 350 (Rose).

124.    After Quinn left, deliberations resumed and continued for about an hour. Tr. 292 (O'Donnell); Tr. 316 (Donahou); Tr. 347 (Rose).

125.    The Trial Committee majority's final vote was the same as its preliminary vote.  Tr. 317 (Donahou); Tr. 351 (Rose).

126.    Donahou and Rose testified credibly that Quinn did not appear to be attempting to influence the decision of the Trial Committee.  Tr. 312 (Donahou) ("Q. Did anyone pressure you to vote guilty?  A. No."); Tr. 346 (Rose) (same).

127.    Nor did Quinn actually influence the decision of any Trial Committee member.  Tr. 317 (Donahou) ("Q. Did anything Mr. Quinn say influence or affect your decision?  A. Not at all."); Tr. 349 (Rose) ("Q. Did anything he say affect your decision? A. No.").

128.    Donahou and Rose ultimately decided, based on the undisputed evidence of Limon's conduct in connection with the $20,000, including his July 9, 2016 email, that Limon's expulsion from the UBC was warranted.  Tr. 317-18 (Donahou); Tr. 351, 372, 374 (Rose).

129.    In sum, Limon did not prove that Quinn's involvement rendered his hearing unfair, affected the outcome, or violated the UBC Constitution or his LMRDA rights.

### 2. O'Donnell's Story About Quinn's Involvement

130. O'Donnell, the dissenting Trial Committee member, has confirmed some of the foregoing facts, and has not disputed others. Tr. 238, 240, 273 (O'Donnell).

131. O'Donnell also claimed, however, that attorney Quinn, on almost a dozen occasions during his 10 or 15 minutes in the hearing room, became "very angry with me," "raised his voice and yelled at me," "pointed his finger," "waived his arms gesticulating quickly and violently," "became red in the face," "scowled," "furrowed his brow," and "physically got up from sitting and stood over me" attempting to influence (unsuccessfully) O'Donnell's vote. Tr. 243, 246-55, 258-59 (O'Donnell).

132. O'Donnell's testimony about his short consultation with Quinn on September 27, 2016 is not credible for several reasons, including:

133. Rose and Donahou, who were present during the entire exchange, credibly denied O'Donnell's version of events. Tr. 316-17 (Donahou) ("Q. Did he appear upset at O'Donnell? A. No."); Tr. 350 (Rose) ("Q. Did Quinn express any anger towards O'Donnell? A. No.").

134. O'Donnell admittedly "stand[s] to benefit from Limon's lawsuit should he win." Tr. 286 (O'Donnell).

135. O'Donnell admits that his testimony is intended to help Limon prevail. Tr. 285 (O'Donnell) ("Q. [Y]ou want to help Limon win his lawsuit, correct? A. Yes. Q. You flew down here to testify for him? A. Yes.").

136. O'Donnell admits that his dissent "was based on what [he] thought was most important" (Tr. 277 (O'Donnell)), yet that document, written on the evening of the deliberations, never claims that Quinn tried to influence anyone. Ex. 43 (Dissent) at 10-12.

137. O'Donnell's written dissent says nothing about Quinn turning red, becoming angry, yelling, gesticulating violently, or looming over O'Donnell. *Id.*

138.    At trial, O'Donnell offered no explanation as to why his written dissent would have omitted such important and dramatic events if they actually occurred. *See* Tr. 221-301 (O'Donnell).

139.    No evidence suggests that Quinn had *any* personal motive to advocate for any particular outcome in Limon's case, let alone one so powerful as to provoke the emotional outburst that O'Donnell described (and that Rose and Donahou denied). Tr. 316-317 (Donahou); Tr. 350 (Rose).

140.    O'Donnell testified that the court reporter's certified transcript of the disciplinary hearing is wrong because, according to O'Donnell, the court reporter failed to transcribe alleged statements by Chairman Donahou preventing O'Donnell from asking questions. Ex. 91 (O'Donnell Dep.) at 185-86 ("Q: [T]he transcript doesn't reflect that, does it?  A: I think it lacks some of that in the transcript, yeah.").[8]

141.    The certified transcript of the disciplinary hearing records O'Donnell asking numerous questions. Ex. 47 (Union Hrg. Tr.) at 13, 14, 18, 21, 45-46, 47, 48-49, 52-53, 59, 60, 61.

142.    Before closing the hearing, Chairman Donahou asked his fellow Trial Committee members if they had any additional questions, and neither O'Donnell nor Rose expressed a desire to ask further questions. Ex. 47 (Union Hrg. Tr.) at 61 ("CHAIRMAN DONAHOU: Any other questions?  MR. ROSE: (No audible response). CHAIRMAN DONAHOU: I show this hearing closed, gentlemen.").

143.    Based on the horseshoe configuration of the tables and seating in the hearing room, it is difficult to picture how Quinn would have "loomed over" any of the Trial Committee members, including O'Donnell. Tr. 316 (Donahou) ("[I]t was kind of a

---

[8] The Court does not have these pages of the deposition and therefore cannot verify this testimony, but Limon does not object to this finding.  The Court has no reason to doubt the skills of the certified court reporter.  The Court would reach the same conclusion without this testimony.

horse-shoe shaped room with the tables. We—all three of us were at the end. [Quinn] came in and sat on the right-hand side, and he just simply answered questions. . . .").

144. O'Donnell never alleged that Quinn "became upset and angry" until 2018, when O'Donnell began pursuing a monetary judgment against the UBC in this lawsuit. ECF 22 (O'Donnell's Pleading) ¶ 60 (alleging that Quinn "became upset and angry").

145. O'Donnell improperly shared confidential UBC documents with Limon in an effort to strengthen Limon's position in this lawsuit. As the Court previously found:

> O'Donnell violated his fiduciary duties under [LMRDA] Section 501 by failing to return UBC's property and records, and by improperly sharing UBC's property with Limon.

ECF 143 (Order Granting the UBC's Mot. for Summ. J.) at 4.

146. In the weeks leading up to Limon's UBC disciplinary hearing, O'Donnell was exploring the possibility of working for another labor union. Tr. 269-70, 301 (O'Donnell).

147. Before the hearing, O'Donnell made up his mind that the "causing dissension" rule in the UBC Constitution can never be lawfully enforced. Tr. 271 (O'Donnell) ("Q. And you do not believe the dissension rule can ever be lawfully applied? A. Correct, yeah.").

148. O'Donnell's belief was legally incorrect, as the Court expressly ruled in granting summary judgment for the UBC on Limon's and O'Donnell's Counterclaim 3 challenging the dissension rule. ECF 174 (Order on SJ re: Facial Challenge to UBC Const.) at 6 ("the Ninth Circuit has found dissension rules reasonable in various circumstances").

149. In the weeks leading up to the hearing, O'Donnell had "questions" and "concerns," yet he did not follow the UBC's written instruction that Trial Committee members should contact the UBC General Secretary if they had "any questions" about the hearing. Tr. 224-30, 270-71 (O'Donnell); Ex. 16, at 3.

150.     In the weeks leading up to the hearing, O'Donnell hired a personal lawyer whom he knew had a history of suing the UBC. Tr. 279 (O'Donnell) ("Q. Ms. Highet had previously sued the United Brotherhood of Carpenters, your employer?  A. She had.").

151.     In the weeks leading up to the hearing, and during six telephone calls on the morning, afternoon, and evening of Limon's hearing and deliberations, O'Donnell failed to mention to his fellow Trial Committee members that he was secretly consulting his own lawyer.  Tr. 280 (O'Donnell); Ex. 91 (O'Donnell Dep.) at 90.

152.     In the weeks leading up to the hearing, O'Donnell secretly conducted his own pre-hearing internet "investigation" into the charges against Limon.  Tr. 281-82 (O'Donnell) ("Q. And prior to the hearing, you conducted your own independent factual investigation?  A. Yes.").

153.     Using the internet, O'Donnell obtained the NLRB docket from the *Musick* matter, the NLRB's decision, Local 1553's post-hearing brief, a collective bargaining agreement between Local 1553 and Raytheon, and government records reflecting the amounts of compensation paid to each of Limon, Griggs, and Dodd.  Tr. 281-82 (O'Donnell).

154.     O'Donnell did not tell the Trial Committee that he had conducted such an investigation.  Tr. 281-82 (O'Donnell) ("Q. You did not tell the other trial panel members?  A. No.").

155.     O'Donnell did not reveal that he had obtained a copy of the Raytheon collective bargaining agreement (Tr. 281-82 (O'Donnell) ("Q. You obtained a copy of a collective bargaining agreement with Local 1553 and Raytheon?  A. Yes.  Q. You did not tell the other trial members?  A. No.")), even though he pretended to complain, in his written dissent, that "the Raytheon collective bargaining agreement" would be a "critically important document[]" without which the Trial Committee could not "make a

fair and impartial decision because we had not concluded a full investigation." Ex. 43 (Dissent) at 11.

156. Chairman Donahou gave the Trial Committee the evening to study the record, and Donahou scheduled continued deliberations for an 8 a.m. breakfast meeting at their hotel the following morning. Tr. 311, 313-14 (Donahou); Tr. 346-48 (Rose).

157. Rather than deal continuing deliberations, O'Donnell spent the evening working with his private attorney on a written dissent. Tr. 280 (O'Donnell) ("Q. You had discussions with her after you went back to your hotel room writing your dissent? A. Yes. . . . Q. You took a picture of a draft of your dissent and sent it to your lawyer? A. I did.").

158. Instead of informing his fellow Trial Committee members that he had decided not to deliberate further, early the following morning, O'Donnell drove to Los Angeles International Airport, leaving Rose and Donahou waiting for him at breakfast:

> Q. You didn't call to let them know that you had checked out?
>
> A. No.
>
> Q. You got in a car and drove to the airport?
>
> A. Yes.
>
> Q. On the way to the airport, Bill Rose called asking where you were?
>
> A. Yes.

Tr. 276-77 (O'Donnell); *see also* Tr. 313-14 (Donahou) ("We met at breakfast, and I—I don't know how long, 15, 20 minutes, seemed like along that, 15, 20 minutes, and I finally asked Rose—I said, 'If you got his cell phone number, would you call him to find out if he's coming down to our breakfast meeting.' [Rose] called, and [O'Donnell] was—he answered, and he was already at the airport."); Tr. 347-48 (Rose) ("Q. What happened the next morning? Did Dan O'Donnell show? A. No, he didn't.").

H. **The Trial Committee's Decision to Expel Limon**

24

1  159.  The Trial Committee voted 2-1 to find Limon guilty on three charges.
2  ECF 200 (Final PTC Order) at Stip. Fact 18.

3  160.  Regarding the "[c]ausing dissension" charge, the majority (Rose and
4  Donahou) reasoned in their written decision:

> In giving the entire settlement to only one of four bargaining unit
> members, Limon pitted one member against the others.  Limon's
> conduct caused dissension as evidenced by the fact that two of the
> three bargaining unit members cheated out of their fair share of the
> settlement filed unfair labor practice charges with the NLRB.

Ex. 43 (Trial Committee Decision) at 5.

161.  As Donahou and Rose explained at trial, they credited Limon's July 9, 2016
email stating that (1) he had made the decision to cheat the three workers whom
Raytheon had harmed and (2) he had lied to the workers and to the NLRB by implicating
Griggs.  Tr. 309-10 (Donahou) ("Q. How do you interpret Limon's July 9th email?  A. I
interpret it that he was telling the truth in this email."); Tr. 345-46 (Rose) ("Q. Did you
think the email was true?  A. Yes.").

162.  Again, Limon's July 9, 2016 email had made no mention of any supposed
"unwritten policy" of Local 1553, and instead had explained that Limon alone had made
the decision to pay only Samoian, despite knowing that Raytheon had harmed all four
workers, because "Kevin Dodd had told me to pay whoever I wanted."  Ex. 6 (July 9,
2016 Email).

163.  Limon chose not to appear for his union disciplinary hearing to offer any
alternative explanation for his conduct or contradictions.  Tr. 122, 175-76, 215-16
(Limon) ("Q. So the [UBC] hearing committee didn't have the benefit of your testimony
that you gave in this court?  A. No.").

164.    Limon's decision to pay only Samoian presented an obvious case of "causing dissension," as that term is understood within the UBC, according to Trial Committee members Donahou and Rose. Tr. 309-10 (Donahou); Tr. 372-74 (Rose).

165.    Rose explained:

> . . . Union officials aren't God. They don't get to choose who gets money and who doesn't get money on a grievance that's filed on behalf of a department. . . . [T]here are some things that are just plain illegal. And if you're saying that the rule was on a grievance that was filed on behalf of individuals or a group of individuals—Okay?—and then you just—then the Union just gets to pick one person out of that group, I'm sorry. That's wrong. That's illegal.

Tr. 364-65 (Rose).

166.    Rose further explained that Limon's wrongful conduct went "deeper" than violating the National Labor Relations Act:

> It goes deeper than that. If you're cheated—now think about it. If you're—say there's a hundred people working with you and you get cheated by your Union. Are you going to tell other people about it? Yes, you're going to tell other people about it. It causes all kinds of havoc.

Tr. 374 (Rose).

167.    Rose also stated:

> [T]he more unity that's involved in a bargaining unit, the stronger that unit is [in negotiating with an employer]; and when . . . things are done to cause fighting amongst the membership, things like giving one person what should have been given to four people. . . . [T]hat kind of stuff ruins Unions.

Tr. 372 (Rose).

26

168.    Donahou also based his vote on the evidence, specifically "the fact that three bargaining employees did not get the settlement, and one bargaining employee did get the settlement," and also that workers "brought charges against the Union.  To me, that caused dissension, too."  Tr. 309-10 (Donahou).

169.    Again, even O'Donnell "could understand how three workers cut out of a settlement would be upset."  Tr. 273-74 (O'Donnell).

170.    Limon cheated three workers whom he was duty-bound to protect, secretly diverting $15,000 from them to his longtime "pal" Samoian—then he lied to the workers to blame others.  *Compare* Ex. 6 (July 9, 2016 Email) *with* Ex. 89 (Limon July Dep.) at 95.

171.    The Trial Committee's decision was motivated by the evidence of Limon's wrongful conduct, which went undisputed at the union disciplinary hearing.  Tr. 309-10 (Donahou); Tr. 345-46 (Rose).

172.    Even in hindsight, both Donahou and Rose feel confident that they made the correct disciplinary decision.  Tr. 317-18 (Donahou) ("Q. Do you have any misgivings about having expelled Limon?  A. No."); Tr. 351 (Rose) ("Q. Do you have any misgivings about voting to expel Limon?  A. No.").

173.    The reasonableness of the Trial Committee's decision that Limon "caused dissension" is confirmed by *Limon's own description* of the workers' reactions:  "they were angry," "grew agitated," "turned red in the face, "[spoke] with an elevated voice," and "they filed unfair labor practice" charges.  Tr. 167-68 (Limon); Ex. 90 (Limon Sept. Dep.) at 49-51.

174.    Indeed, Limon previously admitted (in his union appeal) "error on my part," and that his "hasty decision to only pay Samoian is something that [he] deeply regret[s] and ha[s] agonized over" because it proved "very costly . . . for . . . our Union."  Tr. 171 (Limon); Ex. 3 (Limon's GEB Appeal).

175.    All three Trial Committee members agreed that Limon's July 9, 2016 email contradicted his NLRB testimony.  Tr. 266-67 (O'Donnell); Tr. 310-11 (Donahou); Tr. 345 (Rose).

176.    Even O'Donnell conceded that "[t]he only question at the time [of the disciplinary hearing] was which story was Limon's lie."  Tr. 267 (O'Donnell); *see also id.* at 269 ("Q. Well, you believed Limon lied at the time, correct?  A. Yes, I did.").

177.    All three Trial Committee members agreed that Limon was untruthful; they just disagreed about to whom he had lied: the NLRB or union officials.  Tr. 266-69 (O'Donnell); Tr. 310-11 (Donahou); Tr. 345-46, 361 (Rose); Ex. 43 (Trial Committee Decision) at 4-6.

178.    O'Donnell admitted that it was "reasonable" for the Trial Committee majority to believe what Limon wrote in his July 9 confession:

> Q. So it was reasonable for Donahou and for Rose to believe the opposite of what you believed, that Limon told the truth in the [July 9] email but lied to the NLRB?
>
> A. Reasonable, I would say, yeah.  I don't know what the legal term is, like the legal implications of reasonable, but as I would use reasonable, I would say, yeah, they may have had a different view on that.

Ex. 91 (O'Donnell Dep.) at 166-67.

179.    O'Donnell also admitted that the Trial Committee's guilty verdict was reasonable:

> Q. The trial panel majority found Limon guilty on all charges?
>
> A. Dennis Donahou and Bill Rose, yes.
>
> Q. You found Limon not guilty on all charges?
>
> A. Yes.

Q. And it was reasonable for the other trial panel members to have a different opinion than yours?

A. Yes.

Tr. 268 (O'Donnell).

180.   In an effort to imply that his sanction of expulsion was disproportionate to his offense (and, therefore, evidence of Trial Committee bias), Limon offered at trial evidence of prior sanctions imposed by *the Southwest Council* in past disciplinary cases involving other members.  Ex. 83 (SWRCC Decisions).

181.   Limon offered no evidence, however, of prior sanctions imposed by *the UBC* (the international union) in other disciplinary cases.  Ex. 83 (SWRCC Decisions); Tr. 179 (Limon) ("Q. These are not UBC proceedings at all [referenced in Exhibit 83], are they?  A. No.").

182.   Limon's own disciplinary proceeding was conducted by the international union, not by the Southwest Council.  Ex. 43 (Trial Committee Decision); Tr. 179 (Limon) ("Q. And your hearing was a UBC proceeding?  A. Yes.").

183.   Beyond the information on the face of the single document Limon offered (Ex. 83 (SWRCC Decisions)), he provided no evidence of the facts or circumstances of any of the Southwest Council's past disciplinary cases.  Tr. 177-79 (Limon).

184.   Limon also offered no evidence that expulsion was an unusual sanction for *the UBC* to impose, especially for wrongdoing and circumstances such as his own.

185.   In fact, the UBC has imposed the penalty of expulsion for "causing dissension" in past cases.  Tr. 305-06 (Donahou) ("Q. Have you ever expelled a member for causing dissension?  A. Yes.  Q. Can you give me an example?  A. The one that clearly jumps in my mind is the very first one I did in '97 or '98 in San Francisco.").

186.   In sum, Limon offered no evidence that expulsion was a sanction disproportionate to his conduct, and no evidence of Trial Committee bias.

## I. Developments After Limon's Union Disciplinary Hearing

187.  On November 16, 2016, Limon filed an appeal to the UBC's General Executive Board.  ECF 200 (Final PTC Order) at Stip. Fact 19; Ex. 3 (Limon's GEB Appeal).

188.  The GEB reversed two of the Trial Committee's three guilty findings. ECF 200 (Final PTC Order) at Stip. Fact 20.

189.  The GEB, however, affirmed the Trial Committee's finding that Limon was guilty of "[c]ausing dissension among the members."  *Id.* at Stip. Fact 21.

190.  On June 30, 2017, Limon was expelled from the UBC.  *Id.* at Stip. Fact 22.

191.  Limon did not succeed on his claim that the UBC did not afford him a fair hearing.

192.  Limon was expelled from membership after appropriate proceedings consistent with lawful provisions of the constitution of the UBC.[9]

## J. Limon Did Not Prove Illegal Retaliation

193.  Limon alleged that he and his fellow Local 1553 officers had disagreements with the Southwest Council (*see generally* ECF 90 (SAC)), an intermediate Carpenters union to which Local 1553, under its constitution, was subordinate.  Tr. 189 (Limon) ("Q. You understand that Local 1553 was a subordinate union below the Southwest Council? A. Yes.").

194.  In "[t]he latter part of 2010," Local 1553 officers questioned whether Local 1553 was required to reimburse the Southwest Council for the compensation of the Southwest Council employees who were assigned to Local 1553 as its business agents. Tr. 186 (Limon).

---

[9] *See* 29 U.S.C. § 402(o) (a "member" does not include a person who was "expelled . . . from membership after appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization").

195. "[I]n 2011 or 2012," Local 1553 officers met with Southwest Council representatives on that topic. Tr. 186 (Limon).

196. During that 2011 or 2012 meeting, Local 1553 officer Gary Berouty "did more talking than [Limon] did." Tr. 186-87 (Limon).

197. Local 1553 officers Gary Berouty, Bart Ratia, Mike Curtis, Ben Jiminez, and Mike Buckley also raised questions about Local 1553's reimbursement for business agents. Tr. 187-88 (Limon).

198. Neither Berouty, Ratia, Curtis, Jiminez, nor Buckley has been expelled. Tr. 187-88 (Limon).

199. Under the Southwest Council's bylaws, the Southwest Council had the right to obtain from Local 1553 amounts of money far greater than the amounts it actually invoiced for reimbursement of Local 1553's business agents' pay:

> The Executive Secretary-Treasurer of the Southwest Council may at
> his or her discretion at the end of each fiscal year require any local
> union to transfer any cash, stock, bonds and such cash equivalents that
> are deemed to be excessive, provided the local union is left with at
> least $250,000 in liquid assets.

Ex. 28 (Southwest Council Bylaws) at 15; Tr. 190 (Limon).

200. "[I]n 2014, the Southwest Council reduced the number of business agents from three to two," which "reduced the payments that Local 1553 was paying." Tr. 187 (Limon).

201. Since at least 2010, the Southwest Council has not supported any candidate in an officer election against Limon; he ran unopposed in both the 2013 and 2016 elections. Tr. 188-89 (Limon) ("Q. And in 2013, nobody ran against you? A. That sounds right. Q. And nobody ran against you in 2016? A. No.").

202. Limon offered no evidence of any direct connection between his alleged complaints about the Southwest Council and his 2016 UBC disciplinary proceeding.

203. Limon's argument that such a connection existed is contradicted by the evidence, including that other, more vocal critics of the Southwest Council (such as Berouty) were not punished; that the most intense phase of the alleged disagreement had ended years before the disciplinary charges were filed against Limon; and that the disciplinary charges against Limon were filed immediately after he confessed to sole responsibility for a $15,000 defalcation and to lying under oath about it. Tr. 186-89 (Limon); Ex. 6 (July 9, 2016 Email); Ex. 14 (Limon Charges).

204. Limon offered no evidence that anyone who participated in his disciplinary proceeding had knowledge of any disagreement between Limon and the Southwest Council.

205. Limon offered no evidence that any UBC officer or employee had knowledge of any disagreement between Limon and the Southwest Council before the internal union charges were filed against Limon.

206. Limon offered no evidence that UBC District Vice President Mike Capelli knew about—or filed charges against Limon because of—Limon's alleged protected activity; indeed, Limon did not call as a witness (or offer deposition testimony of) Capelli, whom Limon also did not include on his January 7, 2019 witness list. ECF 190 (Limon Witness List).

207. Donahou and Rose had no knowledge of the alleged disagreements that Limon claims motivated their disciplinary decision. Tr. 303-04 (Donahou) ("Q. Prior to the Limon disciplinary proceeding, what did you know about Limon or Local 1553? A. I didn't."); Tr. 341, 343 (Rose) ("Q. Prior to the Limon disciplinary case, had you ever heard of Phil Limon or Local 1553? A. No.").

208. Even O'Donnell does not claim that the Trial Committee knew anything about those alleged disagreements. Tr. 221-303 (O'Donnell).

209.   O'Donnell's dissenting opinion does not state that Limon's alleged complaints about the Southwest Council played a role in, let alone motivated, the majority's decision.  Ex. 43 (Trial Committee Decision & Dissent).

210.   Limon's disciplinary hearing and decision were wholly independent of any disagreement between Limon and the Southwest Council.

211.   In sum, Limon did not prove that the UBC disciplined him "for" exercising any right protected by the LMRDA.[10]

212.   Further, Limon did not prove that his exercising any right protected by the LMRDA "had a determinative influence on the outcome" of the UBC disciplinary decision.[11]

213.   Limon offered no evidence that his protected conduct was a "motivating factor" at any stage of his disciplinary proceeding.

K.   **Limon Proved No Damages from His Expulsion**

214.   At trial, Limon offered no evidence that his expulsion from the union caused him damage.

215.   Limon could not return to his senior steward position with Local 1553 *because Local 1553 ceased to exist* as a result of a February 2017 merger with Local 721.  Tr. 192 (Limon) ("I was not going to return to work at the senior steward *because Local 1553 had been dissolved*."); Ex. 72 (March 30, 2017 Ltr. from Local 721) ("When Local 1553 merged with Local 721, the By-Laws of Local 1553 ceased to exist and under

_____

[10] 29 U.S.C. § 529 ("It shall be unlawful for any labor organization . . . to fine, suspend, expel, or otherwise discipline any of its members *for* exercising any right to which he is entitled under the" LMRDA) (emphasis added).

[11] *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (interpreting Age Discrimination in Employment Act language similar to language in the LMRDA to mean that protected activity must have "played a role in [the decision] *and had a determinative influence on the outcome*" for civil liability) (quotation marks omitted).

Local 721, the Stewards are appointed, not elected.  At this time, all Stewards positions have been filled.").

216.  Accordingly, Limon's expulsion did not cost him his job.  Tr. 192 (Limon).

217.  Further, Limon was not working, and he was collecting state disability payments, both at the time Local 1553 was dissolved (February 1, 2017) and when the UBC expelled him (June 30, 2017).  Ex. 46 (GEB Appeal Decision); Tr. 191 (Limon) ("my disability ended sometime in around September 2017").

L.  **Limon's Post-Expulsion Demands for Internal Union Records**

218.  On August 21, 2017, seven weeks after his expulsion, Limon sent a "Request for Inspection and Copying LMRDA Section 401(c)" to the Southwest Council and to Local 721, Local 1553's successor.  Ex. 20 (Request).

219.  Limon did not personally draft his "Request for Inspection" (Tr. 179-80 (Limon) ("Q. You didn't draft this letter, did you?  A. No.")), which sought non-public union documents such as "records supporting the entries on Schedule 3, Schedule 15 and Schedule 18 and Item 69 on the Terminal LM-2 Report . . . ."  Ex. 20 (Request).

220.  On August 29, 2017, the Southwest Council's then-President Daniel Langford responded to Limon by email:

> The documents you requested . . . are available at 10:00 am Friday
> September 1, 2017 at 533 S. Fremont Ave. . . .  Please respond to this
> email and confirm that you will appear at that time so we can instruct
> the security in the lobby to allow you in the building.  I also want to
> remind you that you previously requested documents but failed to
> appear after they were made available.  Hopefully, this is not another
> fake request.  It would be your last.

Ex. 21 (Langford Email).

221.  Langford included the last two sentences because Limon, the prior year, had insisted that the Southwest Council search for and compile "hundreds" of collective

bargaining agreements "throughout six states" (purportedly for Limon to inspect), but then Limon "never contacted us again to come and pick those up or review them." Tr. 379 (Langford).

222.    In an effort to avoid litigation, Langford initially decided to allow Limon to inspect (but not copy) the confidential union records Limon was requesting:

> I didn't think it was in the best interest to spend the members' money
> to go into another lawsuit with him so [I] made the decision that—to
> let him review the documents but not copy them.

Tr. 380 (Langford).

223.    Langford "reached out to . . . controller Sam K[yu]ng, showed him the letter [from Limon] and asked him to compile the information." Tr. 377 (Langford).

224.    Before going to work for the Southwest Council, controller Kyung had "worked as an auditor," and Kyung "is the one that compiles all the information for the LM-2 [Annual Financial Report] so he has all the financial records." Tr. 378 (Langford).

225.    Kyung gathered the records, Langford reviewed them, and Limon was permitted to inspect them at the Southwest Council's offices on September 1, 2017. Tr. 378-80 (Langford) ("Q. And was he allowed to review the documents? A. Yes.").

226.    The records totaled at least 25 pages. Tr. 181 (Limon) ("Q. And when you got to the Southwest Council, you were allowed to review about 25 pages of documents, correct? A. Approximately."); *see also* Ex. 22 (Limon Email) at 2 (in which Limon references "the 25 pages you had on table").

227.    After leaving the Southwest Council's office, Limon claimed (in a September 1, 2017 email) that the 25 pages "did not respond to the records I had requested, other than what appeared to be a deed for the Local 1553 property." Ex. 22 (Limon Email) at 2.

228. Limon's claim not to have received the correct records was not accurate. Tr. 381 (Langford) ("Q. [H]e says that he wasn't provided the records he requested. . . . Was that true? A. No.").

229. Limon is "not trained as an accountant" and "not trained as a bookkeeper," as he admitted on cross-examination. Tr. 181 (Limon).

230. Because Limon was claiming (incorrectly) that he had been shown the wrong records, Langford initially decided to allow Limon to pick up photocopies of the records so there could be no dispute about which papers Limon had been given: "the whole idea to give him the documents and entertain his request was to keep us out of a lawsuit," Langford explained. Tr. 381 (Langford).

231. Langford emailed Limon: "The information you requested will be available for pick-up on Tuesday, September 12 at 9 a.m." Ex. 22 (Langford Email).

232. Limon immediately responded to Langford with an email that again misrepresented what records the Southwest Council had made available. Limon wrote: "What information will you have ready for me to pick up, the 25 pages you had on table Friday or all the materials I requested . . . ?" Ex. 22 (Limon Email Response).

233. After further reflection, Langford concluded that Limon was going to pursue litigation against the Southwest Council no matter what (Tr. 381 (Langford))—a conclusion that proved correct when Limon and O'Donnell filed numerous claims against the Southwest Council and its affiliates. ECF 90 (SAC)).

234. Langford therefore decided *not* to make available to Limon for a second time the confidential documents that he had provided to Limon on September 1:

> And I finally decided that we were going to a lawsuit. I kind of understood the tactics he was doing and it led me that we were going to end up in a lawsuit so I had a change of heart.

Tr. 381 (Langford).

235.   On September 12, 2017, the Southwest Council gave Limon a photocopy of the deed to Local 1553's building because Limon had requested a copy of that document and it was not confidential.  Tr. 381-82 (Langford).

236.   Limon claims as "damages" $74.90—gas money for driving downtown. Tr. 159-60 (Limon).

237.   Limon concedes he was receiving state disability payments in September 2017 and missed no wages for driving downtown.  Tr. 180-81 (Limon).

238.   Although Limon asserts a breach-of-contract claim, he testified as follows:

> Q: I am just asking if you have a contract with any of the unions in
> this case.  Is there a contract between you and them?
>
> A: A written contract?  No.
>
> Q: Is there an oral contract between you and any of the unions in this
> case?
>
> A.  No.

Ex. 90 (Limon Sept. Dep.) at 214-15.

239.   Limon has not proven that he entered into a contract with the Southwest Council or Local 721.  Ex. 90 (Limon Sept. Dep.) at 214-15.

240.   Limon has not proven that he agreed to give something of value to the Southwest Council or Local 721, or that there was any bargained-for exchange of value.

241.   In particular, Limon has not proven that the Southwest Council or Local 721 desired any performance from Limon, or communicated to Limon any desire for such a performance, including for Limon's inspecting confidential union records at the union offices.

242.   To the contrary, the Southwest Council communicated to Limon, at most, reluctant acquiescence to Limon's "Request."  Ex. 20 (Request).

243.   Limon has conceded that he was not offering the Unions any consideration:

Q.  You weren't offering the UBC anything of value here.  You were
    just requesting something from the UBC?

A.  I was requesting to inspect and copy.

Ex. 90 (Limon Sept. Dep.) at 210.

244.   Limon retained the unfettered right to choose *not* to visit the Southwest Council to inspect records: he offered no evidence that either party believed that the Unions had the contractual right (let alone the desire) to compel Limon to visit the office and inspect the Unions' records.

245.   Limon has not proven that the Southwest Council or Local 721 knew (or had reason to know) that Limon would interpret any conduct of the Southwest Council or Local 721 as an agreement to enter into a contract.

246.   Limon has not proven the existence of contract terms clear enough that the parties could understand what each was required to do; Limon's requests were drafted in such a manner as to leave considerable doubt as to what records he was requesting or would be sufficient to satisfy his requests' vague language.  Ex. 20 (Request) ("records supporting the entries on Schedule 3, Schedule 15 and Schedule 18 and Item 69 on the Terminal LM-2 Report . . . .").

247.   Because Limon's Requests used technical accounting jargon (Ex. 20 (Request)), his requests should be given the meaning that is usually given to them by people who work in the accounting field, such as the Southwest Council's controller Sam Kyung, who assembled the records for Limon.  Tr. 377-78 (Langford).

248.   Limon conceded that he was unsure what records would be produced in response to his Requests:

Q. [A]s of September 6 you had some question in your mind about
   what the UBC intended to produce.  Right?

A.  Right.

Ex. 90 (Limon Sept. Dep.) at 223.

249.  Accordingly, no "meeting of the minds" occurred between Limon and the Unions as to what records would be produced.

250.  In view of Langford's testimony about the records that controller Kyung compiled (Tr. 377-78 (Langford)), and Limon's concessions that the Southwest Council and Local 721 in fact produced approximately 25 pages of documents in response to his requests (Tr. 181 (Limon); Ex. 22 (Limon Email) at 2), Limon did not prove that the Southwest Council or Local 721 failed to produce documents that fulfilled his requests.

251.  Regarding Limon's "false promise" tort claim, Limon did not prove that the Southwest Council or Local 721 made a promise to Limon that the unions did not intend to fulfill at the time they made the promise.

252.  Limon did not prove that, at the time the Southwest Council emailed Limon on August 29, 2017 (Ex. 21) and on September 6, 2017 (Ex. 22), the Southwest Council and Local 721 did not intend to produce the records.

253.  To the contrary, the Union's decisionmaker (Dan Langford) credibly testified that he intended to, and did, make available to Limon certain records he had requested.  Tr. 377-78, 381 (Langford).

M.  **As a Former Member, Limon Has No Stake in Local 1553's Merger**

254.  Limon went on medical leave and stopped performing the duties of Local 1553's senior steward in September 2017.  Ex. 89 (Limon July Dep.) at 19-20, 76.

255.  On February 1, 2017, while Limon was on medical leave, UBC's General President approved a recommendation to dissolve Local 1553 and merge its members into Local 721.  Ex. 45 (UBC Merger Order).

256.  Limon's expulsion from the UBC "and all of its affiliated bodies" became effective on June 30, 2017 while Limon was still on medical leave.  Ex. 46 (GEB Appeal Decision).

257.  Limon did not prove that he suffered any monetary loss or other concrete harm between February 1, 2017 (the date of Local 1553's dissolution) and June 30, 2017

(the date of Limon's expulsion) because of Local 1553's dissolution. On the contrary, Limon admits he was not working and he continued receiving state disability payments throughout that time period (and until at least September 2017). Tr. 180-81, 191 (Limon).

258. Even if the UBC had not dissolved Local 1553, Limon could not have continued as a Local 1553 senior steward or officer because he had been expelled from the UBC and all of its affiliated bodies. Ex. 46 (GEB Appeal Decision).

259. Under Local 1553's bylaws, a person cannot serve as a Local 1553 senior steward unless he or she is a UBC member "in good standing." Ex. 1 (Local 1553 Bylaws) at 8.

260. Under the UBC constitution, a person cannot serve as a local union officer unless he or she is a UBC member "in good standing" and recorded as such in "the UBC membership processing system." Ex. 49 (UBC Const.) § 31G.

261. Limon did not prove that he suffered "injury in fact"—a "real" and "concrete" injury—as a result of the UBC's dissolution of Local 1553.

262. As a remedy for Counterclaim 6, Limon sought:

> [D]eclaratory relief, an injunction and order directing the UBC . . . to set aside the order dissolving . . . Local 1553 and directing the UBC to return to . . . Local 1553 its charter and all its property . . . and to reinstate all elected officers and stewards of . . . Local 1553 to their former positions.

ECF 90 (SAC) at 59-60.

263.    Limon did not prove that his requested relief would redress any injury to him in view of the fact that he has been expelled from the UBC and all of its affiliated bodies. Ex. 46 (GEB Appeal Decision).[12]

264.    Local 1553 had approximately 918 members at the time of its dissolution. Ex. 18 (2016 LM-2 Rpt.) at 2.

265.    The trial record does not reflect any former Local 1553 member challenging the merger, with the sole exception of Limon.  ECF 90 (SAC) at 59-60.

266.    The trial record does not reflect any former Local 1553 officer or steward seeking an order to be reinstated to his or her former position, with the sole exception of Limon.  ECF 90 (SAC) at 59-60.[13]

# CONCUSIONS OF LAW

## I.    LIMON FAILED TO PROVE HIS 'FAIR HEARING' CLAIM (CC 2)

267.    LMRDA Section 101(a)(5) provides that "[n]o member of any labor organization may be . . . expelled . . . unless such member has been . . . afforded a . . . fair hearing."  29 U.S.C. § 411(a)(5).

268.    "Congress expressly recognized that a union member may be 'fined, suspended, expelled, or otherwise disciplined,' and enacted only procedural requirements to be observed."  *NLRB v. Allis-Chalmers Mfg. Co*., 388 U.S. 175, 194 (1967).

---

[12] For constitutional standing, a plaintiff also must prove that his injury is "*likely* to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 136 S. Ct. 1540, 1547 (2016) (emphasis added).

[13] To have standing, a "plaintiff generally must assert his own legal rights and interests," *Mills v. United States*, 742 F.3d 400, 406 (9th Cir. 2014) (quotation marks omitted), for reasons including that third parties who were affected by a defendant's actions may actually be pleased with the defendant's actions, *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 80 (1978).

269. "While a court should 'apply traditional due process concepts, . . . a union has a significant interest in controlling internal discipline, and [a court need not] require the union's disciplinary proceeding to incorporate the same protections found in criminal proceedings.'" MSJ Order (ECF 208) at 8 (quoting *Myers v. Affiliated Prop. Craftsman Local No. 44*, 667 F.2d 817, 820 (9th Cir. 1982)).

A. **Alleged Trial Committee Bias**

270. Limon alleged that his union disciplinary hearing was unfair because, according to him, the two Trial Committee members who voted to discipline him "could not be fair." ECF 90 (SAC) ¶ 105(e)(i)-(ii).

1. **An LMRDA plaintiff must prove actual bias**

271. Under the LMRDA, "[a]n unbiased or untainted finder of fact is fundamental to a full and fair hearing and procedural due process." *Myers*, 667 F.2d at 820.

272. A person who has "prejudg[ed] the guilt of the accused before the hearing" cannot be an unbiased arbiter. *Id.*

273. "[C]harges that bias undermined the fairness of a disciplinary proceeding must be [proven] by specific fact[s] . . . from which the operation of bias can be inferred." *Frye v. United Steelworkers of Am.*, 767 F.2d 1216, 1225 (7th Cir. 1985).

274. A plaintiff must provide "evidence of actual bias" sufficient to meet his burden of proof. *Holschen v. Int'l Union of Painters & Allied Trades/Painters Dist. Council #2*, 598 F.3d 454, 461-62 (8th Cir. 2010).

275. A plaintiff must prove that a member of his trial committee was "incapable of hearing [his] case impartially." *Yager v. Carey*, 910 F. Supp. 704, 715 (D.D.C. 1995), *aff'd per curiam*, 159 F.3d 638 (D.C. Cir. 1998).

276. Absent evidence to the contrary, trial committee members are presumed to be persons "'of conscience and intellectual discipline capable of judging a particular

controversy fairly on the basis of its own circumstances.'" *Wildberger v. AFGE*, 86 F.3d 1188, 1195 (D.C. Cir. 1996) (quoting *Withrow v. Larkin*, 421 U.S. 35, 55 (1975)).

277.    Limon argues that the legal standard is "risk of bias" or "circumstances that could create a significant risk of actual bias."[14]

278.    Limon cites *Myers*, but it held no such thing.  *Myers* and the cases on which it relies stand for the uncontroversial proposition that someone who has "prejudg[ed] the guilt of the accused before the hearing" cannot be an unbiased arbiter.  667 F.2d at 820. In *Myers*, a panel member was told (falsely) before the hearing that the accused member had confessed to the alleged wrongdoing, and the panel member made up his mind to vote guilty.  *Id.* (citing *Falcone v. Dantinne*, 420 F.2d 1157 (3d Cir. 1969)).

279.    Nor does *Wildberger* support Limon's argument.  In *Wildberger*, the president of the union *who was the specific focus of the repeated criticisms of the accused* (a) initiated the investigation of the accused; (b) supervised that investigation; (c) determined probable cause, (d) determined that a committee investigation of his findings was unnecessary; (e) selected the Trial Committee; (f) and made the final determination of guilt.  Under those circumstances—where the investigative, prosecutorial, and adjudicatory functions were concentrated in one person, and where evidence "casts doubt on the partiality" of that person—the court held that LMRDA due process was implicated.   86 F.3d at 1195-96.

B.    **The Trial Committee's Consultation with Its Legal Advisor**

280.    Limon alleged as part of Counterclaim 2 that the UBC "created an unfair . . . [hearing] procedure by using the UBC's attorney[] . . . to advise the Trial Committee," ECF 90 (SAC) ¶ 105(e)(iv), and that the UBC attorney's "communications [with] the members of the Trial Committee" deprived Limon of a fair hearing, *id.* ¶ 105(e)(v).

---

[14] Even under Limon's proposed legal standard, Limon did not prove his claim as a factual matter.  *See supra* ¶¶ 89-102.  He did not prove any significant risk of bias.

281.     Nothing in the LMRDA prohibits the persons responsible for making a disciplinary decision on behalf of a labor union from consulting with the union's legal counsel.  MSJ Order (ECF 208) at 13 (citing *Bldg. Material & Dump Truck Drivers, Local 420 v. Traweek*, 867 F.2d 500, 511 (9th Cir. 1989)); s*ee also Yager*, 910 F. Supp. at 718 (granting summary judgment in favor of union on claim that union attorney sought to influence trial committee); *United States v. Int'l Bhd. of Teamsters*, No. 88 Civ. 4486 (LAP), 2007 WL 2319129, at *5 (S.D.N.Y. Aug. 9, 2007) (dismissing a claim even though a union lawyer took "an 'unusually active role' in advising the Panel"); *Johnson v. Holway*, No. Civ. A. 03-2513 ESH, 2005 WL 3307296, at *11-13 (D.D.C. Dec. 6, 2005) (granting summary judgment on a claim that a hearing officer's "counsel throughout the hearings, suffered from prejudicial conflicts of interest"); *Mandaglio v. United Bhd. of Carpenters & Joiners of Am. (Gen. Exec. Bd.)*, 575 F. Supp. 646, 653 (E.D.N.Y. 1983) ("[T]he Court finds no procedural improprieties meriting a judgment in plaintiffs' favor.  They have cited no authority which precludes the Trial Committee from having counsel.").

282.     "[T]he presence of a union attorney during the deliberations [would] not constitute a *de facto* violation of [a member]'s rights under the LMRDA."  Amended MSJ Order (ECF 208) at 14 (citing *Traweek*, 867 F.2d at 511).

283.     Furthermore, a union attorney's involvement in a union disciplinary proceeding does not violate a member's right to a fair hearing if the attorney did not "actually influence[] the adjudicators[']" finding of guilt.  *Traweek*, 867 F.2d at 511; *Yager*, 910 F. Supp. at 718 (granting summary judgment where "the Panel reached its decision independently").

284.     Whether Limon's hearing was unfair because of "the involvement of [union] counsel presented 'a question of fact and credibility,'" as Limon asserted in his brief opposing summary judgment.  ECF 164 (Limon's Opp'n to Unions' Summ. J. Mot.) at 15 (quoting *Traweek*, 867 F.2d at 511).

## II.    LIMON FAILED TO PROVE HIS 'RETALIATION' CLAIM (CC 4)

285.   In Counterclaim 4, Limon claimed that the UBC violated LMRDA Section 609 (29 U.S.C. § 529) by allegedly disciplining him for exercising rights protected by LMRDA Section 101(a)(2) (29 U.S.C. § 411(a)(2)) the LMRDA's "free speech" clause:  specifically, for his questioning the Southwest Council's invoices, opposing its preferred candidates for local union office, and otherwise exercising "free speech."  ECF 90 (SAC) ¶¶ 117, 118, 121.

### A. **An LMRDA Plaintiff Must Prove But-For Causation**

286.   LMRDA Section 609 provides: "It shall be unlawful for any labor organization . . . to fine, suspend, expel, or otherwise discipline any of its members for exercising any right to which he is entitled under the provisions of" the LMRDA.  29 U.S.C. § 529.

287.   The Seventh Circuit has held regarding LMRDA Section 609:

> The word 'for' means 'by reason of,' . . . and 'because of.'  These
> same definitions . . . persuaded the Supreme Court [in *Gross v. FBL*
> *Financial Services*] to find that the Age Discrimination in
> Employment Act's parallel language requires that 'the plaintiff bears
> the burden of persuasion to establish [a] 'but-for' cause.'

*Serafinn v. Local 722, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 597 F.3d 908, 915 (7th Cir. 2010) (citations omitted) (quoting 6 *Oxford English Dictionary* 25 (1989), *Webster's Third New Int'l Dictionary* 886 (1981), and *Gross v. FBL Fin. Servs.*, *Inc.*, 557 U.S. 167, 178 (2009)).

288.   LMRDA plaintiffs must prove "but-for" causation.  *See Osburn v. Int'l Alliance of Theatrical Stage Emps.*, No. CV-14-1310-MWF (CWx), 2016 WL 10651031, at *5 (C.D. Cal. Dec. 6, 2016), *aff'd*, 752 F. App'x 385 (9th Cir. 2018) (LMRDA

"Plaintiffs must show that 'but for' their protected conduct, IATSE would not have removed them from their elected positions.").

289.  Protected activity must have "played a role in [the decision] *and had a determinative influence on the outcome*." *Gross*, 557 U.S. at 176 (quotation marks omitted).

290.  At times, Limon has argued (citing employment-discrimination statutes) that an LMRDA plaintiff can establish causation merely by proving that protected conduct was one "motivating factor" in a disciplinary decision, rather than the *but-for* or *determinative* cause.

291.  "A mixed-motive theory of liability," however, "is *never* proper in a suit brought under the LMRDA." *Serafinn*, 597 F.3d at 914-15.

292.  Limon also has argued that the UBC can be found to have disciplined Limon "for" exercising LMRDA rights even if the Trial Committee members who decided to discipline him had no knowledge of his exercise of rights.  Specifically, Limon has argued that the knowledge of UBC agents who had no connection to his disciplinary proceeding should be attributed, by operation of law, to the altogether different UBC personnel who made the decision to discipline him.  His argument is not correct.[15]

293.  "[N]o case law support[s] a[] . . . 'collective scienter' theory." *Nordstrom, Inc. v. Chubb & Son, Inc.*, 54 F.3d 1424, 1435 (9th Cir. 1995), *as amended on denial of reh'g* (Aug. 1, 1995) (securities fraud context); s*ee also United States v. SAIC*, 626 F.3d 1257, 1273 (D.C. Cir. 2010) ("we must vacate and remand for a new trial because the district court's 'collective knowledge' instruction was both erroneous and prejudicial."); *United States v. Scan Health Plan*, No. CV 09-5013-JFW (JEMx), 2017 WL 4564722, at

---

[15] Limon did not prove his claim as a factual matter even under his proposed legal standard. *See supra* ¶¶ 193-213.  He did not prove that anyone at the UBC had knowledge of his alleged disagreements with the Southwest Council.

*5 (C.D. Cal. Oct. 5, 2017) ("A complaint may not rely on the notion that a corporation has 'collective scienter' separate from the scienter of any actual human.").

294.    In a context where *motive* matters—fraud claims—courts in this Circuit have rejected "collective knowledge":

> It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false.  A defendant corporation is deemed to have the requisite scienter for fraud only if the individual corporate officer making the statement has the requisite level of scienter, i.e., knows that the statement is false, or is at least deliberately reckless as to its falsity, at the time that he or she makes the statement.

*In re Apple Comput., Inc., Sec. Litig.*, 243 F. Supp. 2d 1012, 1023 (N.D. Cal. 2002).

295.    The Fifth Circuit has explained what it called "the general common law rule":

> [W]here . . . an essentially subjective state of mind is an element of a cause of action also involving some sort of conduct, . . . the required state of mind must actually exist in the individual making (or being a cause of the making of) the misrepresentation, and may not simply be imputed to that individual on general principles of agency.

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004).

296.    The Restatement (Second) of Agency states:

> If . . . the agent who has the knowledge is not [the] one acting for the principal in the transaction, the principal is not affected by the fact that the agent has the knowledge.  In many situations, in order for one to be responsible, it is necessary that the act should be done with

knowledge in a subjective sense, and it is not sufficient that one has means of information.

Restatement (Second) of Agency § 275, cmt. b (1958).

297. The D.C. Circuit in 2010 explained that courts "have expressed a good deal of skepticism about corporate intent theories that rely on aggregating the states of mind of multiple individuals." *SAIC*, 626 F.3d at 1274.

298. "'[C]ollective knowledge' provides an inappropriate basis for proof of scienter because it effectively imposes liability . . . for a type of loose constructive knowledge that is inconsistent with the [False Claims] Act's language, structure, and purpose." *Id.*

299. *Kimbro v. Atlantic Richfield Co.*, 889 F.2d 869 (9th Cir. 1989), cited by Limon, does not suggest otherwise. *Kimbro* did not concern the LMRDA, but a state employment-discrimination statute with a more relaxed causation standard that effectively permits such aggregation. *See id.* at 876-77 (construing Wash. Rev. Code § 49.60.180). Under that Washington statute, it suffices for liability that the plaintiff's disability was one motivating factor that eventually produced an adverse employment action. *Id.* at 881.

300. In contrast, the LMRDA lacks "language comparable to the [federal] Civil Rights Act's authorization of claims that an improper consideration was '*a motivating factor*' for the contested action." *Serafinn*, 597 F.3d at 915.

301. Two other decisions cited by Limon (*Staub*, 562 U.S. 411 and *Mitchell v. Keith*, 752 F.2d 385 (9th Cir. 1985)) applied statutes (42 U.S.C. § 1981 and the Uniformed Services Employment and Reemployment Rights Act (USERRA)) with "language comparable to the [federal] Civil Rights Act's authorization of claims that an improper consideration was '*a motivating factor*' for the contested action." *Serafinn*, 597 F.3d at 915.

302. The Seventh Circuit held that such a "theory of liability is *never* proper in a suit brought under the LMRDA." *Id.* at 914.

303. The Supreme Court in *Staub* voiced doubt about collective knowledge even under USERRA's more relaxed, "motivating factor" causation standard:

> When a decision to fire is made with no unlawful animus on the part of the firing agent, but partly on the basis of a report prompted (unbeknownst to that agent) by discrimination, discrimination might perhaps be called a "factor" or a "causal factor" in the decision; but it seems to us a considerable stretch to call it 'a motivating factor.'

562 U.S. at 418-19.

304. Furthermore, "a final decisionmaker's wholly independent, legitimate decision to terminate an employee [can] insulate from liability a lower-level supervisor involved in the process who had a retaliatory motive to have the employee fired" when, as a matter of causation, "the termination decision was not shown to be influenced by the subordinate's retaliatory motives." *Lakeside-Scott v. Multnomah County*, 556 F.3d 797, 799 (9th Cir. 2009).

305. "[W]hen a decisionmaker makes a decision based on an independent investigation, any causal link between the subordinate's retaliatory animosity and the adverse action is severed." *Goodsite v. Norfolk S. Ry. Co.*, 573 F. App'x 572, 587 (6th Cir. 2014) (alteration in original) (quotation marks omitted).

306. Legally and logically, a union cannot expel a member "for" protected conduct, 29 U.S.C. § 529, unless the decisionmakers knew about the protected conduct.

## III. LIMON IS NOT ENTITLED TO UNION RECORDS (CC 1/DEC. RELIEF)

307. LMRDA Section 201(c) provides:

> Every labor organization . . . shall make available the information required to be contained in [LM-2] [financial] report[s] *to all of its*

49

> *members*, and every such labor organization . . . shall be under a duty
> enforceable at *the suit of any member* of such organization . . . to
> permit *such member* for just cause to examine any books, records,
> and accounts necessary to verify such report.

29 U.S.C. § 431(c) (emphasis added).

308.   Under LMRDA Section 201(c), a person who has been expelled from the union is not a "member" entitled to inspect union records.  *See id.*

## IV.   LIMON LACKS STANDING TO CHALLENGE THE MERGER (CC 6)

309.   In Counterclaim 6, Limon challenged the UBC's February 2017 decision to dissolve Local 1553 and merge its members into Local 721.  Specifically, Limon claimed that the UBC violated LMRDA Section 609 (29 U.S.C. § 529) by allegedly reorganizing the local unions for the purpose of punishing Local 1553 members for exercising rights protected by LMRDA Section 101(a)(2),[16] including their "refusal to elect [Ken] Keyser as President" of the local union and their "questioning of the SWRCC's bills."  ECF 90 (SAC) ¶ 146(b).[17]  He also alleged that the merger was "not . . . in good faith" and therefore amounted to "discipline" that required a pre-merger "hearing" under LMRDA § 101(a)(5) and § 609. *Id.* ¶¶ 144, 146, 148.[18]

---

[16] 29 U.S.C. § 411(a)(2).

[17] Limon's Counterclaim 6 also references LMRDA Section 102, which creates a civil action for violation of "rights secured by the provisions of this title."  29 U.S.C. § 412. Limon also cites LMRDA Section 609, which forbids unions from punishing a member "for exercising any right to which he is entitled under the [other] provisions of" the LMRDA.  29 U.S.C. § 529.

[18] "[D]iscipline carries the same meaning across § 101(a)(5) and § 609."  *United Steel Workers Local 12-369 v. United Steel Workers Int'l*, 728 F.3d 1107, 1117 (9th Cir. 2013) (alteration and internal quotation marks omitted) (citing *Breininger v. Sheet Metal Workers Int'l Ass'n Local Union No. 6*, 493 U.S. 67, 90 n.13 (1989)).

A. **As a Non-Member, Limon Lacks Article III Standing to Assert This Claim**

310.    Standing doctrine "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).

311.    The Supreme Court has held that "the 'irreducible constitutional minimum' of standing consists of three elements.  The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citation omitted).

312.    "The plaintiff, as the party invoking federal jurisdiction, bears the burden of establishing these elements." *Id.*

313.    "Facts . . . must be . . . proved (at the trial stage) in order to establish standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

314.    Limon cannot establish the existence of at least two constitutional requirements for standing:  (1) "injury in fact" and (2) redressability.

1.    <u>Limon has no "injury in fact"</u>

315.    "To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quotation marks omitted).

316.    The Supreme Court has held:  "A 'concrete' injury must be '*de facto*'; that is, it must actually exist.  When we have used the adjective 'concrete,' we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'" *Id.* (citation omitted).

317.    A plaintiff cannot, "for example, allege a bare procedural violation, divorced from any concrete harm [to the plaintiff], and satisfy the injury-in-fact requirement of Article III." *Id.* at 1549.[19]

## 2.    A judicial decision would not redress any injury of Limon

318.    Injury is necessary for Article III standing, but it is not sufficient.  A plaintiff also must prove that the personal injury is "*likely* to be redressed by a favorable judicial decision." *Spokeo*, 136 S. Ct. at 1547 (emphasis added); *Lujan*, 504 U.S. at 561 ("it must be *likely*, as opposed to merely *speculative*, that the injury will be redressed by a favorable decision") (emphasis added) (quotation marks omitted).

319.    To have standing to seek injunctive relief, a plaintiff must show "that prospective relief will remove the harm."  *Warth v. Seldin*, 422 U.S. 490, 505 (1975) (no standing where plaintiffs could not show that invalidating a town's zoning ordinances would benefit them); *see also Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 45-46 (1976) (no standing where "the complaint suggests no substantial likelihood that victory in this suit would result in respondents' receiving the hospital treatment they desire").[20]

## B. **The Prudential Limit on Third-Party Standing**

320.    In addition to constitutional limits on standing, the Supreme Court has articulated prudential standing barriers.  *See Warth*, 422 U.S. at 499.

321.    One prudential limit is the barrier to third-party standing.  The Supreme Court has explained:  "[E]ven when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . [a] plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Id.*; *see also Mills v. United States*, 742 F.3d 400, 406 (9th Cir. 2014) ("the

---

[19] Limon was not harmed by Local 1553's dissolution because he was on disability leave at the time and, within a short time, had been expelled from the UBC and its affiliates.

[20] A decision on Local 1553's dissolution would not redress any injury of Limon's because he is not a union member.

plaintiff generally must assert his own legal rights and interests") (quotation marks omitted).

322.    One reason for the prudential ban on third-party standing is that the third parties who were affected by a defendant's actions *may actually be pleased with the defendant's actions* (e.g., Local 1553's former members may be pleased that Local 721 now represents them).  *See Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 80 (1978).  The ban on third-party standing thus avoids "the adjudication of rights which those not before the Court may not wish to assert, and the assurance that the most effective advocate of the rights at issue is present to champion them."  *Id.*

323.    Requiring people to assert their own injuries improves the quality of adjudication, as "third parties themselves usually will be the best proponents of their own rights."  *Singleton v. Wulff*, 428 U.S. 106, 114 (1976); *see also Freedom Mortg. Corp. v. Las Vegas Dev. Grp., LLC*, 106 F. Supp. 3d 1174, 1180 (D. Nev. 2015):

> The courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights do not wish to assert them. . . .  [T]hird parties themselves usually will be the best proponents of their own rights.  The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them.[21]

C. **Non-Member Limon is Outside the LMRDA's Zone of Interests**

324.    Another limitation is the rule that the plaintiff must be within the "zone of interests" protected by a particular statute.

___

[21] Of 918 former Local 1553 members, only Limon challenges the merger.  *See* Ex. 18 (2016 LM-2 Rpt.) at 2.

325.   "[T]he question . . . is whether [a particular plaintiff] falls within the class of plaintiffs whom Congress has authorized to sue under" a particular statute.  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014).[22]

326.   Courts must "presume that a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Id.* at 129 (quotation marks omitted).

327.   Identifying the persons protected by LMRDA Sections 101(a)(2), 101(a)(5), and 609—the statutory provisions underlying Counterclaim 6—requires no guesswork, for each provision expressly states whom it protects:  "members."

328.   LMRDA Section 101(a)(2) provides that "[e]very *member* of any labor organization shall have the right . . . to express any views."  29 U.S.C. § 411(a)(2) (emphasis added).

329.   LMRDA Section 101(a)(5) provides that "[n]o *member* of any labor organization may be . . . disciplined . . . unless *such member* has been . . . afforded a . . . fair hearing."  29 U.S.C. § 411(a)(5) (emphasis added).

330.   LMRDA Section 609 provides that "[i]t shall be unlawful for any labor organization . . . to . . . discipline any of its *members* for exercising any right to which he is entitled under the provisions of the LMRDA."  29 U.S.C. § 529 (emphasis added).

331.   The LMRDA defines "member" as "any person who has fulfilled the requirements for membership in such organization, and who neither has voluntarily withdrawn from membership *nor has been expelled* or suspended from membership after

---

[22] Although the Supreme Court historically "placed [the zone-of-interests] test under the 'prudential' [standing] rubric," it recently observed that "'prudential standing' is a misnomer as applied to the zone-of-interests analysis, which [merely] asks whether 'this particular class of persons has a right to sue under this substantive statute.'"  *Lexmark*, 572 U.S. at 127-28 (brackets omitted) (quoting *Ass'n of Battery Recyclers, Inc. v. EPA,* 716 F.3d 667, 675-76 (D.C. Cir. 2013) (Silberman, J. concurring)).

appropriate proceedings consistent with lawful provisions of the constitution and bylaws of such organization."  29 U.S.C. § 402(o) (emphasis added).

332.    A person who was "expelled  . . . from membership after appropriate proceedings" cannot assert the rights of a "member" under LMRDA Sections 101(a)(2), 101(a)(5), and 609.  *See* 29 U.S.C. § 402(o).

## V.    LIMON PROVED NO DAMAGES FROM HIS EXPULSION

333.    To recover damages from an LMRDA violation, a plaintiff bears the burden of proving by a preponderance of the evidence the amount of money that will reasonably and fairly compensate him for his injury.  *See* 29 U.S.C. § 412; s*ee also* 9th Cir. Model Inst. Nos. 5.1-5.2.

## VI.    LIMON FAILED TO PROVE HIS STATE-LAW CLAIMS

### A.    Breach of Contract (CC 8)

334.    Limon alleged (as Counterclaim 8) that he formed a contract with the Southwest Council and Local 721, and that the unions breached that alleged contract by refusing to allow him to inspect union records.  ECF 90 (SAC) ¶¶ 150-57.

335.    To prove that a contract was formed under California law, a plaintiff must prove all of the following: (1) [t]hat the contract terms were clear enough that the parties could understand what each was required to do; (2) [t]hat the parties agreed to give each other something of value.  [A] promise to do something or not to do something may have value; and (3) [t]hat the parties agreed to the terms of the contract. Judicial Council of California Civil Jury Instructions (2018) ("CACI") No. 302 ("Contract Formation—Essential Factual Elements").

Contracts can be created by the conduct of the parties, without spoken or written words.  Contracts created by conduct are just as valid as contracts formed with words.  Conduct will create a contract if the

conduct of both parties is intentional and each knows, or has reason to
know, that the other party will interpret the conduct as an agreement
to enter into a contract.

CACI No. 305 ("Implied-in-Fact Contract").

336. No contract has formed unless "under the circumstances, a reasonable
person would conclude, from the words and conduct of each party, that there was an
agreement." CACI No. 302 ("Contract Formation—Essential Factual Elements").

### 1. The "contract" fails for lack of consideration

337. For a contract to form, "the benefit or prejudice must actually be bargained
for as the exchange for the promise." *Orcilla v. Big Sur, Inc.*, 244 Cal. App. 4th 982,
1006 (2016) (alteration and quotation marks omitted).

338. A plaintiff must prove "[t]hat the parties agreed to give each other
something of value. [A] promise to do something or not to do something may have
value." CACI No. 302 ("Contract Formation—Essential Factual Elements").

339. "[A] promise without sufficient consideration cannot be enforced."
California Civil Jury Instructions (Sept. 2018) (BAJI) No. 10.61 ("Consideration").

340. "Consideration may be either a benefit conferred or agreed to be conferred
upon the person making the promise or some other person, or a detriment suffered or
agreed to be suffered by the person to whom the promise is made or some other person.
Consideration must be bargained for and given in exchange for the promise." *Id.*

341. "In determining whether there was a bargained-for exchange, [the factfinder]
must consider only the outward expression of the intention of the parties." *Id.*

342. "Promises by the parties bargained for and given in exchange for each other
constitute consideration. To be sufficient, the consideration must have some value.
Something that is completely worthless cannot constitute sufficient consideration." *Id.*

56

343.   "It is well settled that something which is completely worthless cannot constitute a valid consideration."  *Grant v. Aerodraulics Co.*, 91 Cal. App. 2d 68, 76 (1949); *see also, e.g.*, *Michaelian v. State Comp. Ins. Fund*, 50 Cal. App. 4th 1093, 1112, *as modified* (Dec. 11, 1996) ("Forbearance to sue on a claim, extension of time, or any other giving up of a legal right may be sufficient consideration for a promise.  It is not sufficient, however, when the claim is wholly invalid or worthless.") (citations omitted).

## 2.     The purported "contract" lacked sufficient clarity

344.   As noted above, to prove that a contract was formed, a plaintiff must prove, *inter alia*, "[t]hat the contract terms were clear enough that the parties could understand what each was required to do."  CACI No. 302 ("Contract Formation—Essential Factual Elements").

345.   A contract "is unenforceable if the parties fail to agree on a material term or if a material term is not reasonably certain."  *Lindsay v. Lewandowski*, 139 Cal. App. 4th 1618, 1622 (2006) (citing *Weddington Prods., Inc. v. Flick*, 60 Cal. App. 4th 793, 811 (1998)); *see also* Cal. Civ. Code § 1580 ("Consent is not mutual, unless the parties all agree upon the same thing in the same sense."); Cal. Civ. Code § 3390(e) (contract not specifically enforceable where terms are "not sufficiently certain" to make act to be done "clearly ascertainable").

346.   A factfinder "should assume that the parties intended technical words used in the [alleged] contract to have the meaning that is usually given to them by people who work in that technical field, unless [he] decide[s] that the parties clearly used the words in a different sense."  CACI No. 316 ("Interpretation—Meaning of Technical Words").

## 3.     The "contract" was illusory

347.   "[W]hen a party to a contract retains the unfettered right to terminate or modify the agreement, the contract is deemed to be illusory."  *Asmus v. Pac. Bell*, 999 P.2d 71, 79 (Cal. 2000) (citing 1 Witkin, Summary of Cal. Law, *Contracts*, § 234 (9th ed.

1987) and quoting 2 Joseph M. Perillo, Helen H. Bender, *Corbin on Contracts* § 5.32 (1995)). "[O]ne who states 'I promise to render a future performance, if I want to when the time arrives,' has made no promise at all." *Id.*

348. "[W]here performance is optional with one of the parties no enforceable obligation exists. This type of promise is illusory and does not result in a binding agreement even if unconditionally accepted." *Sloan v. Stearns*, 290 P.2d 382, 387-88 (Cal. Ct. App. 1955) (citations and quotation marks omitted); *see also Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1439 (2012) ("'One of the most common types of promise that is too indefinite for legal enforcement is the promise where the promisor retains an unlimited right to decide later the nature or extent of his or her performance. This unlimited choice in effect destroys the promise and makes it illusory.'" (quoting 1 Williston on Contracts § 4:27 (4th ed. 2007) and citing 1 Witkin, Summary of Cal. Law, *Contracts*, §§ 230-31 (10th ed. 2005)).

### 4. The Southwest Council and Local 721 did not breach

349. To recover damages for breach of contract, a plaintiff must prove, *inter alia*, "[t]hat [the defendant] failed to do something that the contract required it to do." CACI No. 303 ("Breach of Contract—Essential Factual Elements").

### B. False Promise (CC 9)

350. Limon alleged (as Counterclaim 9) that the Southwest Council and Local 721 committed the tort of "false promise" by promising, and then failing, to produce records for inspection. ECF 90 (SAC) ¶¶ 158-68.

351. For a "false promise" claim, a plaintiff must prove all of the following: (1) [t]hat [the Defendant] made a promise to [Plaintiff]; (2) [t]hat [the Defendant] did not intend to perform this promise when [they] made it; (3) that [the Defendant] intended that [Plaintiff] rely on this promise; (4) [t]hat [the Plaintiff] reasonably relied on [the Defendant]'s promise; (5) [t]hat [the Defendant] did not

perform the promised act; (6) [t]hat [the Plaintiff] was harmed; and (7) [t]hat [the Plaintiff]'s reliance on [the Defendant]'s promise was a substantial factor in causing his harm.

CACI No. 1902 ("False Promise").

352. "To maintain an action for deceit based on a false promise, one must specifically . . . prove, among other things, that the promisor did not intend to perform at the time he or she made the promise and that it was intended to deceive or induce the promisee to do or not do a particular thing." Tarmann v. State Farm Mut. Auto. Ins. Co., 2 Cal. App. 4th 153, 158-59 (1991).

## **CONCLUSION**

353. Judgment will be entered in favor of the Unions as to Counterclaims 1, 2, 4, 6, 8, and 9. The Court declares that Limon, as a non-member, is not entitled to inspect union records.

DATED: July 26, 2019

_____
Honorable Dale S. Fischer
UNITED STATES DISTRICT JUDGE